UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 24-97** |
| **CLIFTON HILL** | **SECTION "H"** |

### ORDER AND REASONS

Before the Court are Defendant's Motion to Dismiss Indictment (Doc. 26) and Motion to Suppress (Doc. 27). An evidentiary hearing was held on December 18, 2024. For the following reason, the Motions are **DENIED.**

### BACKGROUND

Defendant Clifton Hill was indicted on April 25, 2024 on one charge of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Defendant moved to dismiss the charge against him, arguing that it violates the Second Amendment. In addition, he moved to suppress the evidence against him, arguing that the *Terry* stop during which he was found with a firearm violated the Fourth Amendment. The Court held

1

an evidentiary hearing on the latter motion on December 18, 2024. The Court will consider each Motion in turn.

## LEGAL STANDARD

### I. Motion to Dismiss

Pursuant to Federal Rule of Criminal Procedure 12(b), a party may challenge an indictment for failing to state an offense. "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[1] In this circuit, "[t]he propriety of granting a motion to dismiss an indictment . . . is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact . . . . If a question of law is involved, then consideration of the motion is generally proper."[2] A court must take the allegations of the indictment as true and determine whether an offense has been stated.[3] A defendant may not challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence.[4] A court may, however, apply undisputed facts to resolve a question of law with a trial of the general issue.[5]

### II. Motion to Suppress

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[1] FED. R. CRIM. PRO. 12.
[2] United States v. Flores, 404 F.3d 320, 324 (5th Cir. 2005).
[3] United States v. Fontenot, 665 F.3d 640, 644 (5th Cir. 2011).
[4] United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975).
[5] *Flores*, 404 F.3d 320.

2

seizures,' but 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'"[6] Nonetheless, Supreme Court precedent has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."[7] "This rule—the exclusionary rule—is a 'prudential doctrine' . . . created by this Court 'to compel respect for the constitutional guaranty.'"[8] The purpose of the exclusionary rule is "to safeguard Fourth Amendment rights . . . through its deterrent effect."[9]

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights."[10] When the Government performs a warrantless search or seizure, however, the burden shifts to the Government to prove by a preponderance of the evidence that the search or seizure was constitutional.[11]

## LAW AND ANALYSIS

### I. Motion to Dismiss Indictment

Defendant seeks dismissal of the charge against him, arguing that considering recent United States Supreme Court and Fifth Circuit precedent,

---

[6] Herring v. United States, 555 U.S. 135, 139 (2009) (quoting Arizona v. Evans, 514 U.S. 1, 10 (1995)).
[7] *Id.*
[8] Davis v. United States, 554 U.S. 229, 236 (2011) (citations omitted).
[9] United States v. Calandra, 414 U.S. 338, 348 (1974).
[10] United States v. Guerrero–Barajas, 240 F.3d 428, 432 (5th Cir. 2001) (citing United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993)); *see also* United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).
[11] United States v. McKinnon, 681 F.3d 203, 207 (5th Cir. 2012) (citing *Guerrero–Barajas*, 240 F.3d at 428).

3

18 U.S.C. § 922(g)(1) is unconstitutional as applied to him and unconstitutionally vague. The Court will detail relevant Second Amendment law before turning to Defendant's specific challenges.

### A. The State of Second Amendment Law

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[12] In *District of Columbia v. Heller*, the Supreme Court interpreted the language of the Second Amendment clause-by-clause, determining that while "the Second Amendment right is exercised individually and belongs to all Americans," it particularly "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."[13] In an effort to clarify that it did not find the right to bear arms "unlimited," the Court provided an oft-cited list of non-exhaustive "presumptively lawful regulatory measures" upon which courts could call in the future.[14] It stated that *Heller* " should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others.[15]

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court re-visited *Heller*, enunciating a new standard for applying the Second Amendment.[16] It held

> that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To

---

[12] U.S. Const. amend. II.
[13] 554 U.S. 570, 581, 635 (2008).
[14] *Id.* at 626-27, n.26.
[15] *Id.*
[16] 597 U.S. 1 (2022).

4

justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[17]

While the Court stated that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions,"[18] some Justices included disclaimers that enduring bans on felons possessing firearms were still in effect.[19]

The Supreme Court recently upheld the constitutionality of 18 U.S.C. § 922(g)(8), a prohibition on possessing a firearm while subject to a domestic violence restraining order in *United States v. Rahimi*.[20] Applying the logic of *Bruen*, the Court concluded that § 922(g)(8) "fits comfortably" in the Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms."[21]

The Court's decision in *Rahimi* turned on a determination that surety and "going armed" laws at the time of the Founding were proper historical analogues to § 922(g)(8), emphasizing that *Bruen* does not require courts to

---

[17] *Id.* (quoting *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50 n.10 (1961)).

[18] *Id.* at 70 (quoting *Heller*, 554 U.S. at 581).

[19] *Id.* at 81 (Kavanaugh, J., concurring) (Roberts, J. joining) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (quoting *Heller*, 554 U.S. at 616)); *Id.* at 72 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *MacDonald* or *Chicago* about restrictions that may be imposed on the possession or carrying of guns.").

[20] 602 U.S. 680 (2024).

[21] *Id.* at 690.

find a "historical twin" to the modern conduct before them.[22] Surety laws "provided a mechanism for preventing violence before it occurred" by requiring individuals to post bonds when there was a "probable ground to suspect [] future misbehavior."[23] These laws aimed at "prevent[ing] all forms of violence, including spousal abuse" and the misuse of firearms.[24] "So-called 'going armed' laws prohibited 'riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land. Such conduct justified permanent disarmament because it 'disrupted the public order and led almost necessarily to actual violence.'"[25]

In comparing these laws to § 922(g)(8), a majority of the Court found that both laws did not "broadly restrict arms used by the public generally" and were put in place to prevent future harm.[26] Additionally, the Court found that that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that § 922(g)(8) imposes is also permissible."[27] Taken together, the Court concluded that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."[28]

---

[22] *Id.* at 699-700.
[23] *Id.* at 695.
[24] *Id.*
[25] United States v. Wilson, No. CR 22-238, 2024 WL 4436637, at *5 (E.D. La. Oct. 6, 2024) (Long, J.) (quoting *Rahimi*, 602 U.S. at 697).
[26] *Rahimi*, 602 U.S. at 698.
[27] *Id.* at 683.
[28] *Id.* at 700.

The present case concerns § 922(g)(1), a ban on all firearm possession by anyone that has been convicted of a crime with a term of imprisonment that exceeds one year. The Supreme Court has not directly addressed *Bruen*'s impact on the constitutionality of § 922(g)(1). As such, this Court looks to its the Fifth Circuit's decision in *United States v. Diaz* for instruction.[29]

In *Diaz*, applying *Bruen*'s two-part test, the court first determined that Diaz was part of "the people" described in the text of the Second Amendment, regardless of his status as a convicted felon.[30] The court found that *Bruen*'s two-part test could "effectively [be] collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation."[31] The court advised that the government has the burden to "'identify a well-established and representative historical analogue, not a historical twin.'"[32] The court explained that "[i]n assessing similarity," the court should "consider 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'"[33]

The court then evaluated whether § 922(g)(1) as applied to the defendant was consistent with the Nation's tradition of regulating firearm use, considering the defendant's predicate offense of theft.[34] The Fifth Circuit found that several colonial era laws "severely punish[ed] people like Diaz who had been convicted of theft," often with execution.[35] The court stressed that capital

---

[29] *Diaz*, 116 F.4th at 467.
[30] *Id.* at 466.
[31] *Id.* at 467 (citing *Rahimi,* 602 U.S. at 692).
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* at 468–69.

7

punishment laws carry a comparable purpose to § 922(g)(1)'s firearm restriction in that both sought to "deter violence and lawlessness."[36] Finding that punishing those who committed crimes with permanent dispossession of their firearms passed muster under *Bruen*, the Fifth Circuit held that § 922(g)(1) was constitutional on its face and as applied to Diaz.[37]

While the Fifth Circuit concluded that § 922(g)(1) was constitutional on its face and as applied to Diaz, it explicitly did not foreclose the question of whether disarming felons convicted of other offenses fits within the Nation's historical tradition.[38] As such, the Court turns to Defendant's challenges to § 922(g)(1).

## B. Defendant's Arguments

Defendant argues that the 18 U.S.C. § 922(g)(1) charge against him is unconstitutional as applied under the Second Amendment and is unconstitutionally vague. The Court will consider each argument in turn.

### a. Unconstitutional as Applied

First, Defendant argues that § 922(g)(1) is unconstitutional as applied to him under the Second Amendment. Under *Bruen*, the Court must first decide if "the Second Amendment's plain text covers" Defendant's conduct.[39] Here, it does. The Fifth Circuit has held that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)."[40] As such, the Fifth Circuit instructs that:

---

[36] *Id.* at 469.
[37] *Id.* at 471–72.
[38] *Id.* at 470, n.4.
[39] *Bruen*, 597 U.S. at 24.
[40] *Diaz*, 116 F.4th at 467.

8

> The burden thus shifts to the government to demonstrate that regulating [the defendant's] possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." To satisfy this burden, the government must "identify a well-established and representative historical *analogue,* not a historical *twin.*" Evidence must be "relevantly similar" to the challenged law. In assessing similarity, we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."[41]

Accordingly, the Court considers Defendant's predicate offenses. The predicate offenses alleged in the Indictment are Louisiana state law convictions for obstruction of justice, domestic abuse aggravated assault with a dangerous weapon, two counts of aggravated assault with a firearm, and criminally negligent discharge of a firearm.

In considering whether Defendant's predicate offenses support the regulation of Defendant's possession of a firearm, the Court finds the Fifth Circuit's unpublished decision in *United States v. Isaac* persuasive.[42] There, the defendant also had a prior conviction of aggravated assault with a deadly weapon. The Fifth Circuit, relying on *Rahimi*, held that:

> Isaac's as-applied challenge is also foreclosed. "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *United States v. Rahimi*, 144 S. Ct. 1889, 1899 (2024). Here, Isaac previously misused a firearm in an attempt to harm another. A ban on his ability to possess a firearm thus fits easily within our Nation's historical tradition of firearm regulation. *See id.* at 1888–902. Moreover, we recently held that

---

[41] *Id.* (internal citations omitted).
[42] United States v. Isaac, No. 24-50112, 2024 WL 4835243, at *1 (5th Cir. Nov. 20, 2024).

someone convicted of "car theft" could be constitutionally dispossessed of his firearm. *See Diaz*, 116 F.4th at 467, 471–72. A fortiori, someone convicted of aggravated assault with a deadly weapon can be constitutionally dispossessed of a firearm.

Similarly, in *United States v. Bullock*, the Fifth Circuit held that where the defendant "previously misused a firearm to harm others when he shot one individual, fired into a crowd of others, and in the process killed an innocent passerby[,] [a] ban on his ability to possess a firearm 'fits neatly' within our Nation's historical tradition of firearm regulation."[43] In so holding, the court explained that the defendant's violent conduct was "'relevantly similar' to, and arguably more dangerous than, the 'prototypical affray [which] involved fighting in public,' the precursor to the 'going armed' laws punishable by arms forfeiture."[44] It therefore held that "the justification behind going armed laws, to 'mitigate demonstrated threats of physical violence,' supports a tradition of disarming individuals like Bullock pursuant to § 922(g)(1), whose underlying convictions stemmed from the threat and commission of violence with a firearm."[45]

The Court finds the reasoning of *Issac* and *Bullock*, relying on *Rahimi*, compelling in reaching a resolution here. The Nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."[46] Defendant's predicate offenses are violent acts involving a firearm. Accordingly, Defendant's violent conduct is

---

[43] United States v. Bullock, No. 23-60408, 2024 WL 4879467, at *1 (5th Cir. Nov. 25, 2024).

[44] *Id.* (quoting *Rahimi,* 602 U.S. at 681).

[45] *Id.* (quoting *Rahimi,* 602 U.S. at 681).

[46] *Rahimi*, 602 U.S. at 700.

"relevantly similar" to the "going armed" laws punishable by arms forfeiture.[47] Our Nation's historical tradition of firearm regulation supports disarming Defendant where his underlying convictions stem from the "threat and commission of violence with a firearm."[48] Because the government has met its burden to show that applying § 922(g)(1) to Defendant "is consistent with this Nation's historical tradition of firearm regulation," Defendant's as-applied challenge fails.[49]

### b. Unconstitutionally Vague

Next, Defendant argues that § 922(g)(1) is unconstitutionally vague under the Fifth Amendment. He contends that, since *Bruen*, § 922(g)(1) has been held to be unconstitutional as applied to certain subsets of felons. Defendant argues that under this piecemeal approach, felons do not have fair notice of what conduct is criminal, making the statute unconstitutionally vague.

Other sections of this Court have rejected this argument, explaining that:

> [T]his argument misunderstands a vagueness challenge because it challenges a Supreme Court ruling or rulings by other courts as vague instead of the law itself. . . . Defendants do not cite to any language in the law that creates uncertainty or fails to provide them with fair notice of prohibited conduct. Furthermore, defendants do not provide any support for their contention that

---

[47] *Id.* at 698.
[48] *Bullock*, 2024 WL 4879467, at *1.
[49] *See Diaz*, 2024 WL 4223684, at *9.

> Supreme Court precedent can render a clear statute unconstitutionally vague.[50]

A criminal statute survives a vagueness review if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[51] A plain reading of the § 922(g)(1) "supports this finding and provides sufficient notice to ordinary people of the conduct that is prohibited."[52]

Further, Defendant has not identified any authority holding that § 922(g)(1) is unconstitutional when based on an aggravated assault with a firearm predicate offense and therefore fails to demonstrate that § 922(g)(1) is vague with regard to his conduct. Defendant's conduct clearly falls within the conduct prohibited by § 922(g)(1). Accordingly, this argument too fails. Defendant's Motion to Dismiss the Indictment is denied.

## II. Motion to Suppress

Next, Defendant moves for suppression of all of the evidence derived from the stop at issue here. Defendant was stopped by officers who observed a concealed firearm in his waistband while he was standing in the French

---

[50] United States v. Conner, No. CR 23-54, 2023 WL 8474735, at *2–3 (E.D. La. Dec. 7, 2023).

[51] United States v. Edwards, 182 F.3d 333, 335 (5th Cir. 1999).

[52] United States of America v. Curtis Squire, No. CR 24-41, 2024 WL 5057201, at *5 (E.D. La. Dec. 10, 2024).

Quarter. Defendant alleges that officers did not have reasonable suspicion to conduct a *Terry* stop and thus violated his Fourth Amendment rights.

"A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded."[53] A seizure must be "justified at its inception," and "a seizure occurs when an officer objectively manifests an intent to restrain the liberty of an individual through either use of physical force or a show of authority."[54] Courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[55] Officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them."[56] "In order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry."[57]

At the outset, Defendant argues that because carrying a concealed firearm is legal in Louisiana with a permit, the fact that Defendant was carrying a concealed firearm could not create reasonable suspicion of criminal activity to warrant a stop. In so arguing, Defendant relies on cases out of the Third and Ninth Circuits holding that mere possession of a concealed firearm

---

[53] United States v. Garza, 727 F.3d 436, 440 (5th Cir. 2013).
[54] United States v. Wright, 57 F.4th 524, 530–31 (5th Cir. 2023).
[55] United States v. Arvizu, 534 U.S. 266, 273 (2002).
[56] *Id.*
[57] United States v. Scroggins, 599 F.3d 433, 441 (5th Cir. 2010).

does not provide reasonable suspicion for a *Terry* stop when concealed carry is allowed under state law pursuant to a "shall-issue" conceal carry permit regime, like the one in Louisiana.[58] The Fifth Circuit has not expressly addressed whether a person carrying a concealed firearm is, alone, enough to arouse reasonable suspicion to justify a *Terry* stop.[59] Other sections of this Court, however, have considered the issue and found that it is.

In *United States v. Conner*, a section of this court considered decisions out of the Eighth, Ninth, Eleventh, Sixth, and Third Circuits and noted that "[i]n general, courts have held that, where carrying a firearm is 'presumptively illegal,' possession of a firearm may, on its own, support a *Terry* stop."[60] Under Louisiana Revised Statutes § 14:95(A), illegal carrying of a firearm is "[t]he intentional concealment of any firearm" but the prohibition against illegal carrying of a firearm does not apply to "a person with a valid concealed handgun permit." The court in *Conner* explained that "Louisiana law makes the carrying of a concealed firearm presumptively unlawful," and "possession of a valid permit is an affirmative defense in Louisiana."[61] It therefore concluded that possession of a firearm may, on its own, support a *Terry* stop.[62] Another section of this Court adopted this reasoning and agreed "that the possession of a valid concealed carry permit is an affirmative defense in

---

[58] Doc. 27 (citing United States v. Ubiles, 224 F.3d 213, 214, 217–18 (3d Cir. 2000); United States v. Brown, 925 F.3d 1150, 1153–54 (9th Cir. 2019)).
[59] United States v. Wilson, No. CR 22-92, 2023 WL 3601590, at *4 (E.D. La. May 23, 2023) (Africk, J.).
[60] United States v. Conner, No. CR 23-54, 2024 WL 343143, at *8 (E.D. La. Jan. 30, 2024) (Africk, J.).
[61] *Id.* (citing *Wilson*, 2023 WL 3601590, at *4).
[62] *Id.*

14

Louisiana."[63] This Court finds this reasoning compelling, and likewise adopts it as its own.

Having determined that a concealed firearm can arouse reasonable suspicion of criminal activity, the Court considers whether officers had reasonable suspicion to stop Defendant in this case. The Court held an evidentiary hearing on this Motion and makes the following factual findings.

Officer Patrick Booth, a former New Orleans Police Department officer, testified that on November 5, 2023, he was on foot patrol in the French Quarter, tasked with looking for drug and gun violations in the area. He testified that the area in which he was assigned was a high-crime area, especially for gun crimes. Officer Booth testified that he had received training on detecting concealed firearms and that he had made hundreds of gun arrests over his career. He testified that on the date in question, he was stationed at the corner of Bourbon and Conti streets, a popular area of the French Quarter. He testified that the area was well lit by streetlights and business lights. He testified that he spotted what he believed to be a concealed firearm in the waistband of a man later identified as Defendant Michael Hill. Officer Booth testified that after making this observation, he conferred with two other officers with whom he was working. The group moved closer to Defendant to confirm their suspicions. At that point, Officer Booth testified that he could see the distinct outline of a firearm and magazine beneath Defendant's shirt and jacket and that he was "100% positive" that he saw a concealed firearm. Having dispelled any doubts, Officer Booth approached Defendant to introduce himself

---

[63] United States v. Scott, No. CV 23-191, 2024 WL 2023148, at *6 (E.D. La. May 7, 2024) (Africk, J.).

and tell him why he was being stopped. At that point, Defendant "bladed" his body, or turned it away from the officer, presumably to conceal a firearm. Officer Booth then put his hand out to confirm that the bulge was a firearm. Officer Booth admitted that he did not know whether Defendant had a permit to carry a concealed firearm. He testified that permitholders are required to disclose their permit if approached by law enforcement. The Court also reviewed Real Time Crime camera footage and body worn camera footage from the incident, and the videos corroborated Officer Booth's testimony.

The Court finds that Officer Booth identified a "particularized and objective basis for suspecting legal wrongdoing."[64] Officer Booth's testimony and video footage showed that, based on his specialized training, he observed a bulge consistent with a concealed firearm, conferred with other officers regarding his belief, and then moved closer to definitively confirm that he saw a bulge in the shape of a firearm and magazine concealed in Defendant's waistband. Defendant was present in a high crime area, and his body language was consistent with an effort to conceal something from the officer's view. The Fifth Circuit has said that "[a] large bulge located in such an unusual place on a suspect may be a factor warranting reasonable suspicion."[65] Further, "[t]he fact that law enforcement officers know a particular area to be high in crime is indeed a relevant contextual consideration."[66] Other district courts have found

---

[64] *Arvizu*, 534 U.S. at 273 (2002).
[65] United States v. Cooper, 43 F.3d 140, 147 (5th Cir. 1995) (holding that suspicious bulge between defendant's waist and crotch that was crack cocaine was factor, along with defendant's behavior, in establishing reasonable suspicion for *Terry* stop).
[66] United States v. Hill, 752 F.3d 1029, 1035 (5th Cir. 2014).

reasonable suspicion in similar instances.[67] Accordingly, this Court finds that officers had reasonable suspicion to stop Defendant, and his Fourth Amendment rights were not violated.

## CONCLUSION

For the foregoing reasons, the Motions are **DENIED**.

New Orleans, Louisiana this 20th day of February, 2025.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[67] *See Scott*, 2024 WL 2023148, at *6 (holding that "[w]eighing the totality of the circumstances in this case – Scott's presence in a high-crime area, his attire during a heat wave, the bulge, the fact that he was clutching the bulge, and Detective Cockerham's experience and training in identifying concealed weapons – the Court finds that the officers had reasonable suspicion to stop Scott"); *Conner*, 2024 WL 343143, at *8 (holding that the officer's observation of sagging sweatpants pockets and an L shaped object in the pocket, the officer's training in identifying firearms, and the defendant's presence in a high crime area were sufficient to create reasonable suspicion); *Wilson*, 2023 WL 3601590, at *4 (holding that officers had reasonable suspicion to stop the defendant when they observed what appeared to be a concealed weapon on his person); United States v. Williams, 2023 WL 6809836 (E.D. La. October 16, 2023) (Papillion, J.) (holding officers had reasonable suspicion for a *Terry* stop when the observed the defendant standing on at a high-crime intersection at night and clutching at his waistband as an unmarked vehicle approached).